# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM SCOTT REDINGER,** | : | **CIVIL ACTION NO.**    21-12 |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **PARKER-HANNIFIN CORPORATION,** | : | |
| **successor in interest by merger to LORD** | : | |
| **CORPORATION,** | : | |
| | : | |
| **Defendant** | : | |

## CIVIL COMPLAINT

AND NOW, comes the Plaintiff, William Scott REDINGER, by and through his attorney, W. John Knox, Esq. of Sebald, Hackwelder & Knox, and files his Civil Complaint against the Defendant, PARKER-HANNIFIN CORPORATION, successor in interest by merger to LORD CORPORATION, setting forth in support thereof the following:

## PARTIES

1.  Plaintiff, WILLIAM SCOTT REDINGER ("REDINGER"), is an adult individual who currently resides at 5053 Sir Hue Drive, Erie, Pennsylvania 16506.

2.  Defendant, PARKER-HANNIFIN CORPORATION ("PARKER-HANNIFIN"), is an Ohio corporation, authorized to conduct business in the State of Ohio, with a principal place of business located at 6035 Parkland Boulevard, Cleveland, Ohio 44124.

3.  PARKER-HANNIFIN became the successor in interest through a merger with LORD CORPORATION ("LORD") by executing an Agreement and Plan of Merger on April 26, 2019.

4.  LORD is a Pennsylvania corporation, authorized to conduct business in the State of Pennsylvania and the State of North Carolina, with a principal place of business located at 111

1

Lord Drive Cary, North Carolina, 27511. At all times relevant hereto, LORD conducted business in Erie County, Pennsylvania, located in the Western District of Pennsylvania.

5. PARKER-HANNIFIN, is the successor in interest, by way of this merger, to all of the liabilities and causes of action which arose against LORD prior to the merger with PARKER-HANNIFIN.

## JURISDICTION AND VENUE

6. The Plaintiff, REDINGER brings his Complaint under federal diversity jurisdiction, 28 U.S.C. §1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

7. Venue is proper in the Western District of Pennsylvania against LORD, a company with offices located at 2455 Robison Road, Erie, Pennsylvania.

8. Similarly, venue is proper in the Western District of Pennsylvania against PARKER-HANNIFIN, a company with offices located at 8325 Hessinger Drive, Erie, Pennsylvania.

## STATEMENT OF FACTS

9. Mr. REDINGER served as a key executive employee with LORD for 29 ½ years before his separation on October 30, 2017.

10. During his tenure, Mr. REDINGER accumulated 742 Restricted Class B Shares of the Capital Stock of LORD.

11. After his separation, Mr. REDINGER executed an "Election for Repurchase of LORD Corporation Class B Restricted Stock" on November 20, 2017 (the "Election"). Specifically, Mr. REDINGER elected Option 2 on the Election which provided for the repurchase of his Class B shares on a pro-rata basis over five years. LORD provided a Comments Section in the Election

2

form, in which Mr. REDINGER wrote: "**I strongly prefer successive closings to be each December after dividends payment.**" (*Exhibit A, emphasis added*)

12. In the Election, Mr. REDINGER also acknowledged "I understand and agree that the Restated Stock Purchase Agreement with the Corporation <u>shall govern</u>. I understand that in the event I select Options 1 or 2, **successive closings shall be no later than the anniversary of the initial closing.**" (*Exhibit A, emphasis added*)

13. Thereafter, the initial closing took place on **December 14, 2017** with LORD repurchasing 148 of REDINGER's shares.

14. Years earlier on May 14, 2004, Mr. REDINGER and LORD executed the Second Restated Stock Purchase Agreement (the "Purchase Agreement"), which governs the purchase and sale to LORD when an employee retires or is terminated. (*Exhibit B*) Specifically, Section 2(a) of the Purchase Agreement states:

> <u>Retirement or Termination of Employee</u>. Following the retirement or termination of employment of the Employee (regardless of the circumstances of such termination), Lord shall purchase from the Employee and the Employee shall sell to Lord all the Class B Shares then owned by the Employee in accordance with one or more of the following Options, which Options shall be at the election of the Employee.

15. As indicated above, Mr. REDINGER chose Option 2 on the Election, which under Paragraph 2(a) of the Purchase Agreement, provides as follows:

> Option 2- Lord shall purchase the Class B Shares on a pro rata basis **over five calendar years** at the rate of twenty percent (20%) per year to the nearest full share. The initial sale shall be closed at a time fixed by Lord not more than 45 days after the effective date of election under this Option 2. **Successive closing dates shall be no later than the anniversary of the initial closing date** unless on a Saturday, Sunday or business holiday, in which event, such closing shall be on the following business day. The Purchase Price per share for each pro rata portion shall be the applicable price as set forth in Paragraph 4. All closings shall be at the office of Lord during its ordinary business hours. (*Exhibit B, emphasis added*)

3

16. Under Paragraph 4 of the Purchase Agreement, the "Purchase Price" to be paid by LORD depends upon the timing of the closing as it relates to the occurrence of a "Corporate Event."[1] Specifically, if the "purchase by Lord and a sale by the Employee, the closing date of which occurs <u>prior to the date of a Corporate Event</u>, the Purchase Price shall be the Adjusted Book Value (as hereinafter defined) of a single share of Class B Common Stock of Lord as of the end of the most recent fiscal year of Lord prior to the applicable closing date."  (*Exhibit B, emphasis added*) However, if the "purchase by Lord and a sale by the Employee, the closing date of which occurs concurrently with or <u>within ninety (90) days after the occurrence of a Corporate Event</u>, the Purchase Price shall be **the greater of** the Adjusted Book Value as provided in Paragraph 4(a) as of the end of the most recent fiscal year of Lord prior to the occurrence and the 'Fair Market Value' as defined in Paragraph 4(d) below." (*Exhibit B, emphasis added*)

17. Thereafter, on December 1, 2010, Mr. REDINGER and LORD entered into an Amendment to Adopt Restricted Stock Value (the "Amendment") which amended Paragraph 4(a) of the Purchase Agreement as follows:

> In the instance of a purchase by Lord and a sale by the Employee, the closing date of which occurs prior to the date of a Corporate Event, the Purchase Price shall be the Adjusted Book Value or Restricted Stock Value (as hereinafter defined), whichever calculation is applicable, of a single share of Class B Common Stock of Lord as of the end of the most recent fiscal year of Lord prior to the applicable closing date…..For fiscal years commencing on or after January 1, 2011, Restricted Stock Value shall be used which is Adjusted Book Value as of December 31, 2010 (as determined in accordance with the immediately preceding sentence) with adjustments thereafter for cumulative annual earnings per share and dividencds per share, but without any further adjustment for a positive or negative impact attributable to CTA.

(*Exhibit C*)

18. The Amendment also amended Paragraph 4(b) of the Purchase Agreement as follows:

---

[1] Paragraph 2(f) of the Purchase Agreement states that a "Corporate Event" includes a reorganization, merger or consolidation or a sale of fifty-percent (50%) or more of the value of the assets of Lord.

In the instance of a purchase by Lord and a sale by the Employee, the closing date of which occurs concurrently with or within ninety (90) days after the occurrence of a Corporate Event, the Purchase Price shall be the greater of (i) the Adjusted Book Value or the Restricted Stock Value (whichever calculation is applicable), as provided in Paragraph 4 a) as of the end of the most recent fiscal year of Lord prior to the occurrence of the Corporate Event and (ii) the "Fair Market Value" as defined in Paragraph 4 d) below.

(*Exhibit C*)

19. Following the initial closing which took place on December 14, 2017, Mr. REDINGER communicated to LORD's General Counsel, Jon Oeschle and LORD employee Gene Tomczak in early 2018 that he would like to redeem the next 20% of his Class B shares in December of 2018. Mr. REDINGER's communication of his decision to close in December was consistent with his clearly stated preference in the Comments Section of the Election on November 20, 2017. Similarly, Mr. REDINGER's communication of a decision to close in December also was consistent with the specific language in Section 2(a) of the Purchase Agreement and reiterated in the Acknowledgement Section of the Election that "successive closing dates shall be no later than the anniversary of the initial closing date...."

20. Strangely, in response to Mr. REDINGER's communication, Denise Austin, Shareholder Relations Specialist for LORD, sent an e-mail to Mr. REDINGER on February 12, 2018 at 10:00:33 AM, which stated:

> *Scott,*
>
> *I spoke with Jon Oeschle and Gene Tomczak regarding your request for your next redemption to be postponed until December 2018.*
> *Your stock purchase agreement states that after the initial redemption, all subsequent redemptions will occur no later than one year from the anniversary of the first redemption.*
>
> *For all recurring redemptions, LORD closes these transactions as soon as practicable after the year end RSV is set in order to provide shareholders with the remainder of the year to invest their proceeds. This typically occurs over the months of March and April.*

> *For many reasons, LORD is values (sic) a consistent practice year over year and among all retirees. Please plan to identify the next tranche of shares for redemption by March for your 2018 closing.*

> (*Exhibit D*)

21. Following Ms. Austin's February 12, 2018 above, Ms. Austin issued another e-mail to Mr. REDINGER on April 16, 2018 at 4:07 PM which stated:

> *Hi Scott,*

> *Attached is a copy of your current stock ledger.*

> *For the 2018 redemption, please advise what certificate(s) you would like to use to redeem 148 shares.*

> *The redemption price for 2018 is $2,216.83 per share.*

> (*Exhibit E*)

22. In turn, Mr. REDINGER responded to Ms. Austin's e-mail that same day at 5:13:23 PM:

> *Thanks Denise but I have no plans to redeem shares until the anniversary of my previous redemption per the stock agreement.*

>  (*Exhibit F*)

23. On or around the following day, Mr. REDINGER received a telephone call from Jon Oeschle who strongly communicated LORD's steadfast decision to redeem the shares in April as opposed to December as Mr. REDINGER set forth in his Election.

24. Almost a year later, on March 6, 2019, Bloomberg News reported that LORD was working with an advisor on a possible $3 billion sale of the company:

> *Lord Corp. is exploring a sale that could value the closely held adhesives and coatings manufacturer at as much as $3 billion, people with knowledge of the matter said.*

> (*Exhibit G*)

25. The Bloomberg report was picked up by a number of news outlets in Mr. REDINGER's hometown of Erie, Pennsylvania and Mr. REDINGER in turn, broached the issue with Ms. Austin. On March 11, 2019 at 1:42 PM, Jon Oeschle e-mailed Mr. REDINGER:

> *Scott,*
>
> *Denise mentioned that you would like me to speak with you about an article that appeared in Bloomberg News.*
>
> *I don't want to ignore your request, but the company is not commenting on the speculation in the article. The company continues its strong performance.*
>
> *(Exhibit H)*

26. Mr. REDINGER responded to Jon Oeschle's e-mail that same day, March 11, 2019 at 2:45:

> *Thanks Jon, I hope your (sic) doing well, however I wasn't actually expecting comment on a news article. I was looking for confirmation that if I was rehired as a full time employee that my stock liquidation would be halted. Debbie Iavarone indicated you thought it would but I have had no confirmation since the compensation committee meeting a couple of weeks ago. Any update to that?*
>
> *(Exhibit I)*

27. Mr. Oeschle responded to Mr. REDINGER on March 11, 2019 at 4:21 PM:

> *Scott,*
>
> *Happy to address. Before the last board meeting there was discussion of this. While it would have been the Comp Committee's decision, I was prepared to recommend that our stock purchase agreements be clarified in practice so that redemptions would be suspended for the time a retiree returned as a FTE. My understanding is that discussions broke down, so the issue was not raised with the committee.*
>
> *(Exhibit J)*

28. Mr. REDINGER then e-mailed Mr. Oeschle on March 19, 2019 at 10:30 AM:

> *Hi Jon, One last clarification please. There are still opportunities for me at LORD where I could be onboard by April 15. Your message below addresses a clarification to the stock purchase agreement not necessarily what would happen in my case prior*

*to any clarification. Could you please confirm that if I am hired by April 15 I can avoid the upcoming liquidation of 20% of my remaining stock. This is very important to me in regards to whether or not I pursue a position at LORD. If by chance you feel this decision requires compensation committee approval then I respectfully request that you please expedite that approval so that I may retain these valuable shares of LORD stock that I worked so hard for 30 years to obtain.*

(*Exhibit K*)

29. Mr. Oeschle responded on March 19, 2019 at 2:23 PM:

*Scott,*

*Rather than acting on possibilities, I will just stay tuned on the hiring side, and if you come on as a FTE we will take it from there. Meanwhile, the share redemptions are an independent process that continues consistent with past practice and your stock purchase agreement. Denise tells me that based on her current schedule, your redemption would occur on or about 4/17.*

(*Exhibit L*)

30. Finally, Mr. REDINGER replied on April 5, 2019 at 1:48:12 PM:

*Hi Jon, I now believe it is highly probable that I will once again become a LORD employee. I am working with Debbie Iavarone and Jeff Ley (FW engineering manager) to coordinate onboarding on or around April 17; ideally I can be on board by Monday April 15. The three of us are meeting on Monday to finalize some details. I write to you now because I know that Debbie will be out of office from Tuesday to Friday next week and if there is any coordination needed I wanted to give you that heads up. **I am highly concerned about the upcoming stock buyback** and have done everything I can do to get onboard prior to that event. I respectfully ask that **if there is anything you need to do to insure that I keep my LORD stock please, please do so now.** Thanks in advance.*

(*Emphasis added*) (*Exhibit M*)

31. Days later, Mr. REDINGER was informed that he would not be rehired back by LORD. And despite his stated intention in the Election to have the closing of his shares take place in December consistent with the Purchase Agreement's language, the corporation redeemed 148 Class B shares on April 17, 2019.

32. Nine days later, on April 26, 2019, PARKER-HANNIFIN "entered into a definitive agreement to acquire LORD Corporation for approximately $3.675 billion in cash. The transaction has been approved by the Board of Directors of each company and is subject to customary closing conditions, including receipt of applicable regulatory controls." (*Exhibit N*)[2]

33. At no point prior to April 26, 2019 did any employee, executive or representative of LORD disclose to REDINGER the pending merger of LORD with PARKER-HANNIFIN, nor did LORD abstain from redeeming REDINGER's shares in light of the merger prior to April 26, 2019.

## COUNT I – CONSTRUCTIVE FRAUD

## WILLIAM SCOTT REDINGER vs. PARKER-HANNIFIN CORPORATION, successor in interest by merger to LORD CORPORATION

34. Plaintiff incorporates by reference hereto all general allegations set forth in paragraphs 1 through 33 above.

35. Paragraph 12 of the Purchase Agreement provides that the "validity and effect of this Agreement shall be governed by and be construed and enforced in accordance with the laws of the State of North Carolina."

36. The clear and unambiguous language of the Purchase Agreement and the Election does not empower Lord to dictate when the closings in 2018 or 2019 were to take place under Mr. REDINGER's elected Option 2. The language in the Purchase Agreement *does* empower LORD to dictate when the *initial sale* should take place: "The initial sale shall be closed **at a time fixed by Lord** not more than 45 days after the effective date of election under this Option 2." (*Emphasis*

---

[2] The above quote was taken from a press release issued by Parker Hannifin Corporation on April 29, 2019, but Mr. REDINGER subsequently learned through documents issued by Lord, that the "definitive agreement" was entered into on April 26, 2019.

*added*) However, with respect to *successive closings*, **there is no language in the Purchase Agreement that empowers Lord to fix the timing of the closing**:

> Successive closing dates shall be no later than the anniversary of the initial closing date unless on a Saturday, Sunday or business holiday, in which event, such closing shall be on the following business day.

37. If LORD intended to fix the time for successive closings to occur in April each year, it easily could have stated as such in the Purchase Agreement, an agreement that it alone drafted. Similarly, if LORD intended to fix the time for successive closings to occur in April each year, it could have inserted such language into the Acknowledgement Section of the Election form. Instead, LORD merely asked Mr. REDINGER to acknowledge: "I understand that in the event I select Options 1 or 2, successive closings shall be no later than the anniversary of the initial closing." Furthermore, Paragraph 2(a) of the Purchase Agreement stated that redemptions were to occur "over five (5) calendar years." Yet, if the redemptions were to occur every April as expressed after-the-fact by LORD, Mr. REDINGER's redemptions would take place over the course of three years and 4 months.

38. Because LORD failed to vest itself with the discretion to determine the timing of successive closings, such discretion is vested with REDINGER. Consistent with this conclusion, the Comments Section of the Election allowed for REDINGER to exercise this discretion by stating: "I strongly prefer successive closings to be each December after dividends payment." Tellingly, REDINGER's unequivocal, strongly-stated preference for December closings was never rejected, crossed-out or amended by LORD in the Election or in any separate form or agreement thereafter, nor was REDINGER asked to submit a revised Election omitting his comments about December closings. Rather, LORD **accepted** Mr. REDINGER's Election without objection or qualification and went forward with the initial closing on December 14, 2017.

10

39. Notwithstanding these facts, when REDINGER attempted to exercise his discretion to close in December of 2018 as elected, LORD sought to discourage and deter such timing.

40. Again, Ms. Austin, Shareholder Relations Specialist for Lord sent an e-mail to Mr. REDINGER on February 12, 2018 at 10:00:33 AM, which stated:

> *Scott,*
>
> *I spoke with Jon Oeschle and Gene Tomczak regarding your request for your next redemption to be postponed until December 2018.*
>
> *Your stock purchase agreement states that after the initial redemption, all subsequent redemptions will occur no later than one year from the anniversary of the first redemption.*
>
> *For all recurring redemptions, LORD closes these transactions as soon as practicable after the year end RSV is set in order to provide shareholders with the remainder of the year to invest their proceeds. This typically occurs over the months of March and April.*
>
> *For many reasons, LORD is values (sic) a consistent practice year over year and among all retirees. Please plan to identify the next tranche of shares for redemption by March for your 2018 closing.*
>
> (*Exhibit D*)

41. Tellingly, in her February 12, 2018 e-mail, Ms. Austin does not assert that Mr. REDINGER lacks the discretion to determine the timing and nature of successive closings. In fact, Ms. Austin's e-mail reinforces the fact that Mr. REDINGER has discretion concerning this transaction when *she asks him* to "to identify the next tranche of shares for redemption…" She cites no provision of the Purchase Agreement or Election to argue that LORD is solely vested with such discretion. Rather, she merely indicates what LORD's "practice" has been and attempts to appeal to REDINGER's self-interest by explaining that the reason for closing in March or April is to provide shareholders with the purported benefit of having "the remainder of the year to invest their proceeds."

42. Furthermore, when Ms. Austin followed up on April 16, 2018 asking Mr. REDINGER to identify the particular certificates to redeem, Mr. REDINGER responded via e-mail by reasserting his vested discretionary power:

> *Thanks Denise but I have no plans to redeem shares until the anniversary of my previous redemption per the stock agreement.*

> (*Exhibit F*)

43. From November 20, 2017 up through 2019, REDINGER consistently sought to exercise his discretion to determine the timing of successive closings in the month of December pursuant to the Purchase Agreement and the Election he signed. And at every turn, LORD sought to deter, discourage and deny him from exercising this discretion despite the fact that LORD had no authority in the Purchase Agreement or Election to do so.

44. In and before March and April of 2019, LORD and its officers possessed knowledge that it was about to be purchased by/merged into PARKER-HANNIFIN.

45. Ultimately in March and April of 2019, when LORD possessed knowledge that it was about to be purchased by/merged into PARKER-HANNIFIN resulting in a significant windfall to all shareholders, LORD continued to insist upon conducting the closing in the month of April as if its hands were tied, and despite REDINGER's several stated concerns, knowing full well that in doing so, REDINGER would be deprived significant value in the sale of his 148 Class B shares.[3]

46. It is well-settled law that officers of a corporation in North Carolina owe a fiduciary duty to the shareholders. *See* IRA for benefit of Oppenheimer v. Brenner Cos., 107 N.C. App. 16, 419 S.E.2d 354, *disc. review denied*, 332 N.C. 666, 424 S.E.2d 401 (1992).

---

[3] LORD Corporation redeemed 148 of Mr. REDINGERs Class B shares on April 17, 2019 at $2,509.97 per share for a total sale price of $371,475.56  Conversely, based on the final sale price of Lord to Parker Hannifin of $3.675 billion, Mr. REDINGER's shares would sell for $11,587.98 per share after the Corporate Event, for a total sale price of $1,715,021.04  The deprived benefit in value totals $1,343,545.48.

47. Furthermore, officers of a corporation in North Carolina are fiduciaries in their relationship with a shareholder when they are purchasing shares from a shareholder without providing pertinent financial information.  Sullivan v. Mebane Packaging Group, Inc., 158 N.C. App. 19, 581 S.E.2d 452 (2003).  At the very least, a breach of that fiduciary duty to a shareholder selling his shares subjects corporate officers to liability under a theory of constructive fraud.

48. "Constructive fraud arises where a confidential or fiduciary relationship exists, and its proof is less 'exacting' than that required for actual fraud." Cash v. State Farm Mut. Auto. Ins. Co., 137 N.C. App. 192, 206, 528 S.E.2d 372, 380, affirmed, 353 N.C. 257, 538 S.E.2d 569 (2000).

49. In order to show constructive fraud, a plaintiff must establish (1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction.  Walker v. Sloan, 137 N.C. App. 387, 40102, 529 S.E.2d 236, 246 (2000).

50. Moreover, **where a fiduciary relationship exists between the parties, a presumption of fraud arises** where the superior party obtains a possible benefit. Cash, 137 N.C. App. at 206, 528 S.E.2d at 380.  This presumption can be rebutted where there is a showing that the other party obtained independent advice.  Id.

51. Mr. REDINGER at no point sought independent advice that would rebut this presumption.

52. A fiduciary relationship existed between LORD, its officers, employees and REDINGER as a shareholder of LORD, thereby creating a relationship of trust and confidence between the parties.

53. The fiduciary relationship and the relationship of trust and confidence surrounded the consummation of the transaction whereby REDINGER agreed to sell his shares on April 17, 2019 back to LORD.

54. LORD's intentional actions and omissions in concealing knowledge of the pending sale of LORD to PARKER-HANNIFIN which was to occur nine (9) days after the redemption/sale of REDINGER's Class B shares on April 17, 2019, constitutes constructive fraud.

55. As a proximate result of LORD's constructive fraud, REDINGER suffered actual economic damages in the amount of $1,343,545.48, plus interest and costs of suit.

56. Due to the intentional actions and omissions in committing constructive fraud against REDINGER, the Defendant is subject to the imposition of punitive damages under North Carolina law, N.C.P.I. Civil 810.96.

## COUNT II – BREACH OF FIDUCIARY DUTY

### WILLIAM SCOTT REDINGER vs. PARKER-HANNIFIN CORPORATION, successor in interest by merger to LORD CORPORATION

57. Plaintiff incorporates by reference hereto all general allegations set forth in paragraphs 1 through 56 above.

58. Fiduciaries under North Carolina law are required to act in good faith and with due regard to plaintiff's interests.

59. Furthermore, North Carolina law is clear that the officers of LORD are fiduciaries in their relationship with a shareholder generally, and specifically, officers of LORD are fiduciaries in their relationship with a shareholder such as REDINGER when they are purchasing shares from him.

14

60. Here, the LORD officers' fiduciary relationship "surrounded the consummation of the transaction" involving the successive closings of his Class B shares, including the April 2019 closing.

61. The significant evidence cited in this Complaint establishes that the officers of LORD failed to act in good faith and with due regard to REDINGER's interests in the 2019 sale of his 148 shares of Class B stock.

62. At every turn, LORD sought to deter, discourage and deny REDINGER from exercising his vested power to determine the timing of successive closings, despite the fact that LORD had no authority in the Purchase Agreement or Election to do so.

63. And when LORD possessed knowledge that it was about to be purchased by/merged into PARKER-HANNIFIN, LORD and its officers sought to benefit themselves by continuing to insist upon conducting the 2019 closing in the month of April knowing full well that in doing so, REDINGER would be deprived significant value in the sale of his 148 Class B shares.

64. Simply put, when a shareholder such as REDINGER has consistently, clearly and strongly expressed intention to sell his shares in December—a decision-making power not prohibited in any way by the clear language of legally-enforceable documents drafted by LORD no less—and LORD has an absolute legal duty to act in good faith as a fiduciary to that shareholder "surrounding the consummation of the transaction," LORD cannot continue to deter, discourage or deny that shareholder from selling those shares in December or at any other time of his choosing *especially* when LORD knows that in preventing the shareholder from doing so would cause that shareholder to be deprived of $1,343,545.48 in share value.

65. Alternatively, regardless of REDINGER'S expressed intention to sell his shares in December each year, LORD has an absolute legal duty to act in good faith as a fiduciary to that

shareholder "surrounding the consummation of the transaction." And to that end, LORD should have at the very least, abstained from redeeming the shares and demanding that the shareholder sell those shares on April 17, 2019, nine days before LORD'S merger with PARKER-HANNIFIN when LORD knew that in doing so would cause REDINGER to be deprived of $1,343,545.48 in share value.

66. LORD's actions with respect to the redemption/sale of REDINGER's Class B shares on April 17, 2019 were not carried out in good faith nor with due regard to plaintiff's interests.

67. As a proximate result of LORD's breach of fiduciary duty to REDINGER, REDINGER suffered economic damages in the amount of $1,343,545.48, plus interest and costs of suit.


## COUNT III – NORTH CAROLINA SECURITES ACT, SECTION 78A-56-CIVIL LIABILITIES

## WILLIAM SCOTT REDINGER vs. PARKER-HANNIFIN CORPORATION, successor in interest by merger to LORD CORPORATION

68. Plaintiff incorporates by reference hereto all general allegations set forth in paragraphs 1 through 67 avove.

69. LORD purchased and redeemed REDINGER's Class B shares on April 17, 2019 by means of a material omission of fact by not disclosing the pending sale of LORD to PARKER-HANNIFIN which was to occur nine (9) days after the redemption/sale of REDINGER's Class B shares on April 17, 2019.

70. LORD owed a fiduciary duty to REDINGER to disclose the pending sale of LORD to PARKER-HANNIFIN or refrain from purchasing REDINGER'S Class B shares.

71. Prior to selling his Class B shares to LORD, REDINGER did not know nor could have reasonably known of the pending sale of LORD to PARKER-HANNIFIN or that representatives

16

of LORD were omitting from REDINGER information of the sale of LORD to PARKER-HANNIFIN.

72. Due to LORD's omission of information from REDINGER of the sale of LORD to PARKER-HANNIFIN prior to the sale/redemption of REDINGER's Class B shares on April 17, 2019, LORD violated Section 78A-56(b) of the North Carolina Securities Act.

73.  As a proximate result of LORD's violation of Section 78A-56(b) of the North Carolina Securities Act, REDINGER suffered economic damages in in the amount of $1,343,545.48, plus interest and costs of suit.

<u>**COUNT IV – BREACH OF CONTRACT**</u>

<u>**WILLIAM SCOTT REDINGER vs. PARKER-HANNIFIN CORPORATION, successor in interest by merger to LORD CORPORATION**</u>

74. Plaintiff incorporates by reference hereto all general allegations set forth in paragraphs 1 through 73 above.

75. The Purchase Agreement and Amendment together constitute a legally binding contract supported by adequate consideration.

76. Under Paragraph 4 of the Purchase Agreement, the "Purchase Price" to be paid by LORD depends upon the timing of the closing as it relates to the occurrence of a "Corporate Event", which includes a reorganization, merger or consolidation or a sale of fifty-percent (50%) or more of the value of the assets of Lord. (*Exhibit B*)

77.  Specifically, if the "purchase by Lord and a sale by the Employee, the closing date of which occurs prior to the date of a Corporate Event, the Purchase Price shall be the Adjusted Book Value (as hereinafter defined) of a single share of Class B Common Stock of Lord as of the end of the most recent fiscal year of Lord prior to the applicable closing date."  (*Exhibit B*) However, if

the "purchase by Lord and a sale by the Employee, the closing date of which occurs <u>concurrently</u> <u>with or within ninety (90) days after the occurrence of a Corporate Event</u>, the Purchase Price shall be **the greater of** the Adjusted Book Value as provided in Paragraph 4(a) as of the end of the most recent fiscal year of Lord prior to the occurrence and the 'Fair Market Value' as defined in Paragraph 4(d) below." (*Exhibit B, emphasis added*)

78. The purchase by LORD and the sale by REDINGER of 20% of his Class B shares, which closed on April 17, 2019, occurred concurrently with or within 90 days of the Corporate Event where PARKER-HANNIFIN entered into a definitive agreement to acquire LORD for approximately $3.675 billion in cash on April 26, 2019.

79. Because the April 17, 2019 closing occurred concurrently with or within 90 days of the Corporate Event in question, REDINGER should have been paid the greater of the Fair Market Value for his Class B shares as defined in the Purchase Agreement and Amendment or the Adjusted Book Value.

80. Because the definitive agreement of April 26, 2019 provided that PARKER-HANNIFIN purchased the shares of LORD for approximately $3.675 billion in cash, the Fair Market Value of the Class B shares was an amount greater than the Adjusted Book Value of the Class B shares.

81. However, at the April 17, 2019 closing, LORD paid REDINGER a price for his Class B shares based on the Adjusted Book Value of a single share of Class B Common Stock of LORD as of the end of the most recent fiscal year of LORD prior to the applicable closing date.

82. The failure of LORD to pay REDINGER the Fair Market Value of his Class B shares on April 17, 2019 was a material breach of the Purchase Agreement and Amendment.

83. As a proximate result of LORD's material breach of the Purchase Agreement and Amendment, REDINGER suffered economic damages in in the amount of $1,343,545.48, plus interest and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, WILLIAM SCOTT REDINGER, prays for relief against the Defendant, PARKER-HANNIFIN CORPORATION, successor in interest by merger to LORD CORPORATION as follows:

(A) Entry of judgment declaring the Defendant intentionally committed constructive fraud under North Carolina law with respect to the sale and redemption of Plaintiff's Class B shares on April 17, 2019;

(B) Entry of judgment declaring the Defendant committed a breach of fiduciary duty under North Carolina law with respect to the sale and redemption of Plaintiff's Class B shares on April 17, 2019;

(C) Entry of judgment declaring the Defendant violated Section 78A-56(b) of the North Carolina Securities Act with respect to the sale and redemption of Plaintiff's Class B shares on April 17, 2019;

(D) Entry of judgment declaring the Defendant committed a breach of contract under North Carolina law with respect to the sale and redemption of Plaintiff's Class B shares on April 17, 2019;

19

(E) An order awarding damages in the amount of $1,343,545.48 and punitive damages under North Carolina law, N.C.P.I. Civil 810.96 to compensate Plaintiff for Defendant's constructive fraud, together with interest and costs of suit;

(F) An order awarding damages in the amount of $1,343,545.48 to compensate Plaintiff for Defendant's breach of fiduciary duty, together with interest and costs of suit;

(G) An order awarding damages in the amount of $1,343,545.48 to compensate Plaintiff for Defendant's violation of Section 78A-56(b) of the North Carolina Securities Act, together with interest and costs of suit.

(H) An order awarding damages in the amount of $1,343,545.48 to compensate Plaintiff for Defendant's breach of contract, together with interest and costs of suit;

(I) Entry of judgment against Defendant and in favor of Plaintiff on all applicable counts;

(J) Finding that Defendant's actions were in all respects conducted willfully, intentionally, and for economic gain.

(K) That Plaintiff be awarded punitive damages.

(L) That Plaintiff be awarded both pre-judgment and post-judgment interest on each and every damage award.

(M) That Plaintiff be awarded any other damages and such other further relief as this Court may deem just and proper.

Respectfully Submitted,

**SEBALD, HACKWELDER & KNOX**

*/s/ W. John Knox, Esq.*

By_____

       W. JOHN KNOX, Esq.
       PA ID # 77484
       137 East 13th Street
       Erie, Pennsylvania 16503
       Tel. 814-833-1987
       E-Mail: wjk@shkerie.com
       **Attorneys for Plaintiff**

Dated:  January 6, 2021